**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| THOMAS L. TAYLOR III, solely in his capacity as Court-appointed temporary receiver for Breitling Energy Corporation, *et al.*, | § § § § | |
| Plaintiff, | § | |
| | § | Case No.: _____ |
| v. | § | |
| | § | |
| ROTHSTEIN KASS & COMPANY, PLLC and BRIAN MATLOCK, | § § | |
| Defendants. | | |

---

**RECEIVER'S ORIGINAL COMPLAINT**

---

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  PARTIES .......................................................................................................... 4

III. JURISDICTION & VENUE ............................................................................. 6

IV. Factual Background ......................................................................................... 6

    **A.** The Breitling Fraudulent Scheme ................................................................. 6

        1.  The "BOG Phase" of Faulkner's Fraudulent Scheme .............................. 7

        2.  The "BECC Phase" of Faulkner's Fraudulent Scheme ............................ 9

    **B.** Rothstein's Auditing Activities in Conjunction with the Reverse Merger ...... 12

        1.  Materially Misleading Cost Estimates in the AFEs Included in the CIMs ............... 13

        2.  Comingling of Investor Proceeds in General Operating Accounts ........................... 16

        3.  Overselling of Interests in Numerous Offerings ....................................... 17

        4.  Material Reimbursements to Faulkner ..................................................... 20

        5.  Complete Lack of Internal Controls ......................................................... 21

        6.  Defendants' Failed to Track the Use of Proceeds in Auditing the Financial Statements in Accordance with GAAS ..................................... 22

        7.  Failure to Require Going Concern Disclosure and Modify Audit Opinions ............. 24

        8.  Failure to Classify and Disclose Crude as a Consolidated Entity / Variable Interest Entity ........................................................................ 24

    **C.** Defendants' Acts and Omissions in Performing the Breitling Audit Caused the Breitling Entities to Sustain Substantial Damages ...................................... 26

V.  STATUTE OF LIMITATIONS DEFENSES ..................................................... 27

    **A.** Discovery Rule / Inquiry Notice / Equitable Tolling ...................................... 27

VI. CAUSES OF ACTION ....................................................................................... 28

    **COUNT I: Negligence/Gross Negligence** ..................................................... 28

    **COUNT II: Aiding, Abetting, or Participation in Breaches of Fiduciary Duties** .......... 29

**COUNT III: Aiding, Abetting, or Participation in Faulkner's Fraudulent Scheme** ................................................................................................................ 30

**COUNT IV: Avoidance of Fraudulent Transfers** ............................................. 31

VII.    ACTUAL DAMAGES ................................................................................. 32

VIII.   PUNITIVE DAMAGES ............................................................................. 32

IX. CONDITIONS PRECEDENT ........................................................................ 33

X.  JURY DEMAND ............................................................................................ 33

XI. PRAYER ......................................................................................................... 33

Plaintiff Thomas L. Taylor III ("Plaintiff" or "Receiver"), solely in his capacity as temporary receiver appointed by orders entered in the civil action styled *Securities and Exchange Commission v. Christopher A. Faulkner, Breitling Energy Corporation, Jeremy S. Wagers, Judson F. ("Rick") Hoover, Parker R. Hallam, Joseph Simo, Dustin Michael Miller Rodriguez, Beth C. Handkins, Gilbert Steedley, Breitling Oil & Gas Corporation, Crude Energy, LLC, Patriot Energy, Inc., Defendants, and Tamra M. Freedman and Jetmir Ahmedi, Relief Defendants*; No. 3:16-cv-01735-D; in the United States District Court for the Northern District of Texas, Dallas Division ("Enforcement Action"), files this Original Complaint ("Complaint") against Rothstein Kass & Company, PLLC ("Rothstein") and Brian Matlock ("Matlock") (collectively, "Defendants"), and alleges the following:

## I.    INTRODUCTION

1.      The Receiver brings this action to recover damages sustained by Breitling Oil & Gas Corporation ("BOG"), Breitling Royalties Corporation ("BRC"), Breitling Energy Corporation ("BECC") (collectively the "Audit Entities") -- and their alter egos Crude Energy, LLC ("Crude Energy"), Crude Royalties, LLC ("Crude Royalties") and Patriot Energy, Inc. ("Patriot") (collectively with the Audit Entities, "Breitling") -- as a result of Rothstein and Matlock's failure to exercise the degree of care, skill and competence that reasonably competent members of their profession would exercise under similar circumstances in conducting their audit of the Audit Entities, which audit was not conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

2.      Beginning in 2011, and continuing through 2016, Christopher A. Faulkner ("Faulkner") orchestrated a massive fraud through Breitling and other entities under his control, raising approximately $150 million in gross proceeds from investors through the offer and sale of

oil and gas-related securities. During this time, Faulkner (including without limitation individually and through entities under his control) misappropriated approximately $32.8 million in Breitling funds, both through the receipt of transfers from Breitling accounts (including under the color of expense reimbursements), and through the payment of personal expenses from Breitling bank and credit card accounts. From the inception of the fraud, Faulkner made use of the assets of the Breitling entities to fund a lavish lifestyle -- including multiple homes across the country, acquisition of luxury goods, and international travel and entertainment.

3.     In or about September 2013, the Audit Entities engaged Rothstein to conduct an audit of BOG and BRC's 2011 and 2012 financial statements, among other things, in anticipation with Faulkner's taking those entities public (as the entity BECC) through a reverse merger transaction with Bering Exploration, Inc. ("Bering Exploration"). The Audit Entities relied on the Defendants to conduct this audit through the exercise of "the degree of care, skill and competence that reasonably competent members of their profession would exercise under similar circumstances." *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 185 (Tex. App. 1987, writ denied); *see also In re Sunpoint Secs., Inc.*, 377 B.R.513, 556 (Bankr. E.D. Tex. 2007) (same). As detailed below, Defendants failed in their charge and breached their duties to Breitling.

4.     In the early stages of Rothstein's audit, Defendants uncovered (or, but for their negligence and/or gross negligence, would have uncovered) facts which would have clearly indicated to a reasonably competent certified public accountant that (1) Faulkner was using the Breitling entities to engage in a fraudulent scheme for his personal benefit, and (2) Faulkner was conducting ongoing fraudulent securities offerings in breach of his fiduciary duties to the Breitling entities. Notwithstanding Defendants' knowledge of these red flags, they failed to adjust the scope of the audit to account for potentially fraudulent activity, failed to resign and continued to conduct

the audit, and enabled the continuation of the fraudulent scheme, ultimately issuing an unqualified audit opinion of the Audit Entities' financial statements which BECC filed with the Securities and Exchange Commission ("Commission").

5.       In this regard, and without limitation, Defendants knew (or, but for their negligence and/or gross negligence, would have known) that:

a.       Breitling had reimbursed Faulkner for approximately $5 million in purported "Lead" generating expenses for 2011 and 2012, and failed to provide any invoices or detailed explanations to Defendants;

b.       the purchase price of investment units in Breitling offerings was based upon cost estimates -- prepared internally by Breitling staff in breach of industry norms -- which exceeded actual costs by over 1,000 percent in some instances;

c.       Breitling regularly sold to investors a larger percentage of working interests ("WI" or "working interests") in oil and gas prospects than Breitling owned;

d.       Breitling conveyed to investors a larger percentage of royalty interests and overriding royalty interests ("RI" or "royalty interests") in oil and gas prospects than Breitling owned, severely clouding title to these interests and putting at risk all revenue/assets generated by such offerings; and

e.       Breitling personnel made misrepresentations to Defendants during the audit regarding the inflated cost estimates and the over-selling of oil and gas-related securities.

6.       The myriad red flags that Defendants encountered during their audit should have triggered heightened scrutiny including, without limitation, under Statement on Auditing Standards No. 99 ("SAS 99") with respect to potentially fraudulent activity; under GAAS rules governing due professional care, internal controls, and competent evidentiary matter; under

Statement on Auditing Standards No. 59 ("SAS 59") regarding the ability of Breitling to continue as a going concern; and under Financial Accounting Standards Board ("FASB") Interpretation Nos. 46 and 46R ("FIN 46") with respect to consolidation for Breitling's financial statements. Defendants were required to adjust the scope of the audit to address a heightened risk of fraud at Breitling and expand the scope of their testing and analysis of internal controls, or to resign from the engagement. Instead, Defendants failed to adjust the scope of the audit to account for potentially fraudulent activity and failed to resign from the audit, ultimately issuing an unqualified audit opinion of the Audit Entities' financial statements.

7.      Defendants' negligent and grossly negligent actions (and inaction) paved the way for Faulkner to continue his use of the Breitling entities as vehicles for his fraud, thereafter enabling Faulkner to misappropriate more than $18 million in Breitling assets, clouding and risking loss of title to oil and gas-related assets, and exposing Breitling to over $70 million in increased liabilities, including without limitation substantial liabilities to professionals (particularly, but not exclusively, with respect to the administration of the Receivership Estate) and other creditors. But for Defendants' acts and omissions, the scale of the overall Breitling fraudulent scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

## II.   PARTIES

8.      Plaintiff Thomas L. Taylor III was appointed as temporary receiver pursuant to Orders entered in the Enforcement Action. *See* Case No. 3:16-cv-01735-D, ECF No. 108, as amended by ECF No. 142, as amended by ECF No. 320, as amended by ECF No. 418 (collectively

referred to as the "Receivership Order").[1] Plaintiff currently serves as temporary receiver for the estates of Faulkner, BOG, BRC, BECC, Crude Energy, Crude Royalties (together, "Crude"), Patriot, Breitling Ventures Corporation, Breitling Holdings Corporation, Breitling Operating Corporation, Inwood Investments, Inc. and Grand Mesa Investments, Inc. (collectively, excluding Faulkner, the "Receivership Entities") (the "Receivership Estate"). Receivership Order at p. 1, at ¶2. Plaintiff has been appointed over the "Receivership Assets", *id*. at ¶2, which includes "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by…, directly or indirectly," Faulkner and the Receivership Entities. *Id*. at p. 1. The Receiver asserts the causes of action herein on behalf of BOG, BRC, BECC, Crude and Patriot.

9.      Defendant Rothstein was at all times relevant to this Complaint a Texas professional limited liability company with its principal place of business in Texas located at 2525 McKinnon Street, Suite 600, Dallas, TX 75201. Rothstein will be served through its counsel Nicolas Morgan of Paul Hastings LLP, 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071.

10.      Defendant Matlock was at all times relevant to this Complaint an individual residing in Texas. At times relevant to this Complaint, Matlock was a Senior Manager and, later, a Principal, of Rothstein in Dallas, Texas. Matlock will be served through his counsel Nicolas Morgan of Paul Hastings LLP, 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071.

---

[1] Unless otherwise specified, citations to the Receivership Order refer to pages and paragraphs in Dkt. 418.

### III.  **JURISDICTION & VENUE**

11.     This Court has jurisdiction over this action, and venue is proper, as the Court that appointed the Receiver, and under Section 22(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v(a)), Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa) and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754). Venue in the Northern District of Texas is proper as at all times relevant to this Complaint, Rothstein's principal place of business in Texas was located in the Northern District of Texas. Additionally, the vast majority of the wrongful conduct alleged herein with respect to Rothstein occurred in the Northern District of Texas.

### IV.  **FACTUAL BACKGROUND**

**A.  The Breitling Fraudulent Scheme**

12.     Enforcement Action defendants Faulkner, Parker Hallam ("Hallam") and Dustin Michael Miller Rodriguez ("Rodriguez") founded Receivership Entities BOG and BRC in 2009 and 2010, respectively. Through these entities -- and later BECC, Crude, and Patriot -- Faulkner orchestrated and implemented a multi-million-dollar fraudulent scheme through the offer and sale of securities to public investors. Breitling received investor proceeds regularly from approximately January 2011 through February 2016. The Commission commenced the Enforcement Action on June 24, 2016.

1. *The "BOG Phase" of Faulkner's Fraudulent Scheme*

13.     From the inception of BOG and BRC through December 8, 2013[2] (the "BOG Phase") Faulkner served as their President and Chief Executive Officer, controlled their overall direction, and managed their day-to-day operations.

14.     The main business activity of BOG and BRC was the management and syndication of oil and gas-related projects. BOG offered and sold securities related to oil and gas working interests. BRC offered and sold securities related to oil and gas royalty interests. Potential investors in Faulkner's scheme were identified using lead lists, Google advertisements, and inquiries generated through visitors to the companies' website(s), Faulkner's speaking engagements at conferences and media appearances by Faulkner. BOG and BRC employees regularly contacted prospective investors using cold calls.

15.     The terms of BOG and BRC securities offerings were provided to public investors through offering materials in the form of Confidential Information Memoranda and Private Placement Memoranda ("CIMs"). BOG and BRC offered and sold these securities through persons who were neither registered with the Commission as brokers nor associated with registered broker-dealers. The Breitling CIMs were replete with material misrepresentations and omissions of material facts.

16.     At the core of Faulkner's scheme were estimates of how much it would likely cost to drill and complete the wells contemplated in the working interest securities offerings, and how much the investments would likely earn. Faulkner received estimates for drilling and completion costs -- known as Authority for Expenditures ("AFEs") -- from the operators that actually drilled

---

[2] By a reverse merger that closed on December 9, 2013, BOG/BRC merged with Bering Exploration, becoming majority shareholders of then-renamed BECC.

and completed oil and gas wells. Instead of including these estimates in the CIMs, however, Faulkner, without basis, grossly inflated these estimates -- including his bloated figures in the offering documents provided to investors. BOG then tied the price of units in the investments to these inflated cost estimates, and sold the investments on a lump sum or "turnkey" basis to investors.

17.     Because BOG kept the difference between the total amount of money they raised from investors on each offering and the actual costs of drilling and completing any wells, this gross inflation of the AFEs by Faulkner ensured that Breitling would pocket millions of dollars in inflated profits from unwitting investors, from which Faulkner could fund his lavish lifestyle.

18.     Faulkner also regularly "over-sold" units in BOG offerings. In this regard, BOG sold to investors a larger percentage of working interests in a prospect than BOG actually owned. Rather than disclosing this fact to investors, however, BOG and Faulkner covertly skirted their overselling by moving investors out of the oversold prospect and into different prospects, advising investors that BOG was exercising its contractual right to reassign investors to comparable prospects. Contrary to the terms of the CIMs, BOG often placed investors in substitute prospects in different states with different operators, providing materially different ownership interests than those bargained for by the investors.

19.     In furtherance of Faulkner's scheme, and without disclosure to investors, BOG and BRC extensively comingled the assets they received from investors. Although generally (but not exclusively) investor funds were received in offering-specific accounts, they were almost exclusively thereafter transferred into general "operating accounts" prior to the completion of drilling and other completion costs associated with the wells, and comingled with the proceeds of investors in other, distinct offerings. Funds transferred to these "operating accounts" included the

excess of funds illicitly received by Breitling as a result of the grossly inflated AFEs, which defrauded investors believed would be used to fund the working interest prospects underlying the BOG offerings.

20.     Faulkner directed Breitling personnel to pay business expenses from these accounts, sometimes with respect to oil and gas offerings, meaning that one investor's money was necessarily being spent on expenses for a different offering. Moreover, it was from the "operating accounts" that Faulkner directed the payment of credit card bills representing millions of dollars in charges for personal expenses, and from which Faulkner was reimbursed for personal expenses which he claimed, without support, were made on behalf of Breitling.

21.     During the BOG Phase, BOG and BRC raised approximately $81.5 million in gross proceeds from investors. During this period, Faulkner misappropriated over $15 million from company coffers.

   *2.   The "BECC Phase" of Faulkner's Fraudulent Scheme*

22.     In or about 2013, Faulkner conceived to take BOG and BRC public through a "reverse merger" transaction. A reverse merger occurs when a private company merges into a shell company that is already publicly-traded; the private company thereby becomes a public company. The transaction results in a single, publicly-traded entity, the name of which is changed to that of the formerly private company, and which is controlled by the owners of the formerly private company.

23.     On or about December 9, 2013, BOG and BRC closed the transaction through which they acquired the publicly-traded company Bering Exploration, renaming it Breitling Energy Corporation (and changing its ticker symbol to BECC). Faulkner, Hallam, and Miller

owned over 90 percent of BECC's common stock through their ownership of BOG and BRC. Faulkner became the President and CEO of the public entity BECC.

24.     In anticipation and furtherance of the reverse merger transaction, and in conjunction with the preparation of public filings made with the Commission, the Audit Entities engaged Rothstein in or about September 2013 to conduct an audit of BOG and BRC financial statements for the years ending December 31, 2011 and 2012. Defendant Matlock was the Rothstein Senior Manager / Principal in charge of the audit performed on behalf of the Audit Entities.

25.     From December 9, 2013 through February 2016 (the "BECC Phase"), Breitling raised approximately $68.5 million in gross proceeds from investors. During this period, Faulkner misappropriated at least $18.5 million from Breitling.

26.     Contemporaneously with the reverse merger, Faulkner created Crude Energy and Crude Royalties and installed BOG and BRC co-founders Hallam and Rodriguez as officers. In or about March 2015, following a falling out with Hallam, Faulkner transferred these responsibilities from Crude to Patriot, with Rodriguez installed as officer. The Patriot entity was created by changing the name of another shell entity owned by Faulkner, Simple Solutions, Inc. Faulkner opened new bank accounts styled "Simple Solutions d/b/a Crude Energy" in order to intercept incoming checks intended for investments in Crude's offerings, and directed Rodriguez (also an officer of Crude) to assign all of Crude's oil-and-gas working interests to Patriot. Patriot simply continued Crude's operations under a new name.

27.     Faulkner "outsourced" BECC's sales mechanism (previously undertaken by BOG and BRC directly) to Crude and Patriot, including the BECC sales team and other BECC employees. Crude and Patriot undertook to offer working interest and royalty interest-related securities to BECC's list of public investors. As detailed below, Defendants knew (or but for their

gross negligence would have known) of Crude's/Patriot's inextricably intertwined connection to the Audit Entities.

28.     Although Defendants knew (or but for their gross negligence would have known) the true nature of the relationship between BECC and Crude/Patriot, it was not disclosed to investors or in public filings with the Commission. BECC's public filings disclosed only that BECC and Crude executed an Administrative Services Agreement ("ASA") contemporaneous to the closing of the reverse merger. In or about April 2015, BECC executed an ASA with Patriot containing materially equivalent terms and disclosed it in a public filing. The ASAs gave these relationships an aura of legitimacy and helped make them appear arm's-length in nature. In truth, however, Crude and Patriot were alter-egos of BECC, and their financials were consolidated with those of BECC.

29.     Pursuant to the ASAs, BECC would give Crude/Patriot access to its client list and oil and gas-prospect list so that Crude/Patriot could offer oil and gas prospects to BECC clients. In return, Crude/Patriot would provide various administrative services to BECC. In exchange, Crude/Patriot would be entitled to certain management fees related to the oil and gas-prospects, and responsible for payment to BECC. The Crude ASA included terms for the payment to BECC of $100,000 per month, $150,000 per oil and gas-prospect delivered to Crude, and a carried interest of 20% in any prospect acquired by Crude for sale to clients. The April 2015 ASA with Patriot increased these payments to BECC to $200,000 per month, $250,000 per oil and gas-prospect delivered to Patriot, and a carried interest of 25% in any prospect acquired by Patriot for sale to clients.

30.     In reality, however, Breitling records contain no evidence that either Crude or Patriot made any payments to BECC in connection with the ASAs, and there are no records

identifying any recurring monthly payments from Crude or Patriot to BECC for the ASA fees. Rather, Breitling records reflect a repeated and consistent flow of investor funds from Crude and Patriot to BECC. In this regard, Faulkner caused Crude and Patriot to collectively transfer over $39 million to BECC, a majority of all funds received into BECC accounts.

31.     The offering activities of Crude and Patriot mirrored the offering activities of BOG and BRC. Crude and Patriot continued to deliver materially misleading offering documents to potential investors, including the material omission of Faulkner and BECC's true relationship with Crude and Patriot. The AFEs contained in the CIMs continued to be grossly inflated without any reasonable basis. Investor funds were not only comingled in "operating accounts" but outright transferred to a purportedly independent, arms-length company (BECC) and used to pay hundreds of thousands of dollars for Faulkner's BECC American Express bills, including his personal expenses.

32.     Additionally, BECC actually consolidated Crude's (and later Patriot's) results of operations in its general ledger, a fact never disclosed to the public in BECC's filings or to investors in Crude's offerings. In this regard, Crude cash balances often represented the majority of the funds reported by BECC as its cash balances in filings with the Commission.

**B.  Rothstein's Auditing Activities in Conjunction with the Reverse Merger**

33.     In anticipation and furtherance of the reverse merger transaction, and in conjunction with the preparation of public filings with the Commission, the Audit Entities engaged Rothstein as auditor. Defendant Matlock was the Rothstein Senior Manager / Principal in charge of the Breitling engagement. Among other tasks, Defendants conducted an audit of BOG and BRC financials for the years ending December 31, 2011 and December 31, 2012.

34.     Rothstein's engagement began in or about September 2013, and Defendants proceeded with the audit at issue until Rothstein's resignation in or about June 2014. On or about April 14, 2014, Rothstein issued an unqualified audit opinion with respect to the Audit Entities' annual financial statements. Rothstein issued this unqualified audit opinion notwithstanding that it knew, or but for its gross negligence would have known, that Faulkner was using Breitling to implement a vast fraudulent scheme from which he could misappropriate funds at-will.

35.     Under Statement on Auditing Standards No. 99, auditors must consider potential fraud when auditing a client's financial statements. As detailed below, what Defendants learned in the initial months of their audit of Breitling triggered heightened scrutiny under SAS 99, and Rothstein was required to either: (i) adjust the scope of its audits to address a heightened risk of fraud at Breitling and expand the scope of its audit testing and analysis of internal controls; or (ii) possibly resign from the engagement. Instead, Defendants failed to adjust the scope of the audit to account for potentially fraudulent activity, failed to resign from the audit engagement, and ultimately issued the unqualified audit opinion of the Audit Entities' financial statements.

36.     In December 2013 -- less than three months into Rothstein's audit of the Audit Entities -- Defendants had knowledge sufficient to place them on notice of the true nature of Faulkner's conduct and his abuse of the Receivership Entities in furtherance of his own financial interests. In this regard, Rothstein prepared an Issues Memorandum ("Issues Memorandum") which reads like a first draft of the Commission's eventual complaint against Faulkner and Breitling in the Enforcement Action.

1.  *Materially Misleading Cost Estimates in the AFEs Included in the CIMs*

37.     Among the material issues known to Defendants was the inflation of the AFEs included with the CIMs and provided to potential investors. Defendants describe the CIMs as

"materially inaccurate when it came to the proper details of the offerings." Defendants knew that the AFEs were "grossly inflated in the CIMs and lead the potential investors into believing the costs for developing the wells would be much greater [than] actually incurred."

38.    Defendants detailed eight Breitling offerings, the AFEs for which estimated that drilling and other costs would equal approximately $18 million. The actual costs for these projects was just under $5.4 million. The "estimated" costs, which Defendants knew were provided by Breitling personnel rather than by the oil and gas operators (which was the industry norm), exceeded actual costs by approximately $12.6 million -- or 336 percent. Defendants further knew that AFE cost estimates for some offerings exceeded actual drilling and other costs by over 1,000%.

39.    Importantly, Defendants also knew that Faulkner and his subordinates' response to this information about the inflated AFEs was materially misleading, and wholly inadequate -- it focused on Defendants' apparent disregard of "the extensive overhead required to support the transaction." Had Defendants "consider[ed] the direct and indirect overhead involved[,] three of the wells would be a loss," they claimed. As Defendants knew, however, the CIMs specifically represented that overhead-type costs and fees (including organization and offering expenses, such as printing, accounting, and legal costs, as well as fees related to sponsorship, management and supervision of the offering, or Breitling's efforts on behalf of investors in dealing with operators) would be borne by Breitling, and not paid from investor proceeds. Defendants knew that the AFEs were materially inflated so as to be misleading to potential investors, and that Breitling officers had no credible justification for their being so. Defendants also knew that Breitling securities offerings to public investors were ongoing throughout the engagement.

40.     Additionally, Defendants knew that "the AFEs were created based on little to no due diligence" by Faulkner or his subordinates. Moreover, Breitling personnel prepared the AFEs internally, rather than the operators drilling and operating the wells -- which Defendants knew breached industry norms. Defendants knew that Faulkner and his subordinates would lack information and control over drilling details and therefore the AFEs inherently would be less accurate.

41.     Defendants also knew that the quality of, and attention to detail given to, the CIMs and AFEs was materially deficient. In this regard, Defendants knew that some AFEs for separate offerings, in different fields and to be performed by two separate operators, were merely copies of each other. Moreover, the AFEs often were so vague that it was not clear whether they included multiple wells or a single well.

42.     The Defendants' "solution" to the inflated-AFE issue was to defer the recognition of the revenues from the offerings until the wells at issue were completed, and all costs had been paid. These actions, taken by Breitling, did not solve the problem but rather only delayed the recognition of assets on the financial statements to which BECC was not entitled. The distinction between a current asset and a deferred asset is immaterial when that asset is only present, as known by Defendants, as a result of fraud and offset by a greater liability to the investors in that offering.

43.     Defendants continued to conduct the audit, failed to adjust the scope of the audit to account for potentially fraudulent activity, and ultimately issued an unqualified audit opinion of the Audit Entities' financial statements notwithstanding their knowledge of assets obtained pursuant to material misrepresentations made to investors in the CIMs and AFEs by Faulkner, and the effects of same on Breitling's financial statements. This knowledge should have triggered increased scrutiny by Defendants with respect to potential fraud occurring at Breitling, but

Defendants ignored these clear red flags, violating their duty to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses. But for Defendants' acts and omissions, the scale of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

2. *Comingling of Investor Proceeds in General Operating Accounts*

44.     The Defendants further knew of Faulkner's practice of comingling investor proceeds from various offerings in the general operating accounts of the Audit Entities before the final drilling and completion costs for the offerings were expended from an offering's segregated account. The failure to disclose this comingling constituted a material omission from the representations made in the CIMs.

45.     In this regard, the BOG CIMs represented that all proceeds raised from the offer and sale of units "will be deposited into a segregated bank account" and that "[a]ll payments for Drilling and Testing Costs and Completion and Equipment Costs shall be paid from the segregated account." Instead, Faulkner acted contrary to these representations by: (i) transferring substantially all of the funds from its segregated, prospect-specific bank accounts into its general and operating bank accounts, including before making any payments on a prospect; (ii) depositing hundreds of thousands of dollars of investor proceeds directly into BOG's general and operating bank accounts; and (iii) depositing over a million dollars of investor funds earmarked for one prospect into the segregated offering account set up for a different prospect. Defendants knew that investor proceeds were transferred to general operating accounts prior to completion of the wells "in almost all cases."

46.     Defendants continued to conduct the audit, failed to adjust the scope of the audit to account for potentially fraudulent activity, and ultimately issued an unqualified audit opinion of

the Audit Entities' financial statements notwithstanding their knowledge of the material misrepresentations made to, and omissions from, investors in the CIMs by Faulkner regarding the segregation of investor proceeds. This knowledge should have triggered increased scrutiny by Defendants with respect to potential fraud occurring at Breitling, but Defendants ignored these clear red flags, violating their duty to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses.

### 3. *Overselling of Interests in Numerous Offerings*

47.     The Defendants further knew of Faulkner's practice of "over-selling" units in offerings. In this regard, BOG sold to investors a larger percentage of working interests in a prospect than BOG actually owned. The failure to disclose this overselling constituted a material omission from the representations made in the CIMs.

48.     BOG sold a number of units which exceeded the number of units that the CIMs disclosed would be available for sale. Instead of disclosing this fact to investors, BOG and Faulkner surreptitiously papered over the overselling by moving investors out of the oversold prospect and into different prospects, advising investors that BOG was exercising its contractual right to reassign investors to comparable prospects.

49.     As Defendants knew, BOG often placed investors in substitute prospects in different states with different operators, providing materially different ownership interests than what investors had bargained for. BOG's indiscriminate reassignment of investors to different wells or prospects than the ones in which they had invested was not authorized by or disclosed in the offering materials, and was false, deceptive, and misleading.

50.     Defendants also knew that Faulkner and his subordinates made misrepresentations to them when they raised the issue of the overselling of one of the offerings. Faulkner and his

subordinates initially represented that the CIM had been revised such that the prospect had not been oversold. However, a revised CIM was never provided to Defendants and, after a time it was represented that the investor interests were instead moved to other prospects as a substitution. Further, the transfer letters given to Defendants were not dated, and after further inquiry Defendants were told the transfer occurred in mid-2013, notwithstanding that the original over-sale occurred in late 2011.

51.     Just as Faulkner and his subordinates over-sold working interest offerings to investors, they over-conveyed royalty interests to investors as well, as Defendants knew or, but for their negligence (and/or gross negligence) in performance of the audit, should have known. In this regard, beginning prior to Defendants' engagement to conduct the audit of the Audit Entities, there was some effort by BRC (and later Crude) to convey royalty interests to investors directly, and to place these investors in "direct pay" with the oil and gas operators, rather than processing their royalty payments through the offering entity, as was generally the case with working interest investments.

52.     In almost all cases, however, material discrepancies exist in the conveyance instruments executed by the offering entity in favor of these investors and, in many instances, recorded in official real property records in various counties of several States. Specifically, the offering entities "over-conveyed" royalty interests, creating an anomalous situation in which investors collectively received -- of record -- more than 100 percent of the interest which the offering entity purported to own.

53.     Pursuant to CIMs, the offering entity was to retain a portion of the royalty interests purchased for the pool of investors, typically 10%. However, the over-conveyance of royalty interests to investors had great potential to impact the offering entity's balance sheet, because of

the risk that the conveyance of more than 100% of the royalty interest purchased by the offering entity would effectively be a transfer of the interest retained by the offering entity pursuant to the PPM. In other words, if BRC was supposed to transfer 90% of the royalty interests it purchased with investor proceeds to investors *pro rata*, but instead transferred 120% of the royalty interests it purchased with investor proceeds, it risked losing the 10% retained interest in those royalty interests -- all of its revenue for that offering.

54.     In all of these instances, title to the royalty interests conveyed by the offering entity is, at minimum, clouded -- vis-à-vis both Breitling's interest and the investors' interests. As a result of these title defects, (i) oil and gas operators have suspended royalty payments to Conveyance Investors and Offering Entities under the Texas Natural Resources Code, Section 91.402(b); and (ii) these royalty interests are unmarketable for resale. In this regard, the assets of the Audit Entities were materially affected -- potentially all of the carried interests they were to receive as revenue for the offerings is at risk.

55.     BECC failed to disclose these issues materially affecting its financial statements in its public filings with the Commission. Moreover, Defendants failed to detect BRC's potential transfer of all revenues it gained from its securities offerings, which failure breached its duties to Breitling to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses. This failure by Defendants has resulted in significant damages. These damages include the professional expenses required to defend title to the royalty interests at issue, and the value of any royalty interests lost as a result.

56.     Defendants continued to conduct the audit, failed to adjust the scope of the audit to account for potentially fraudulent activity, and ultimately issued an unqualified audit opinion of the Audit Entities' financial statements notwithstanding that they knew, or but for their negligence

and/or gross negligence, would have known, that Breitling potentially transferred away the revenues from their royalty interest-related securities offerings. This knowledge should/would have triggered increased scrutiny by Defendants with respect to the potential loss of Breitling revenues, but Defendants ignored these transactions or red flags which would have alerted them to these transactions, violating their duty to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses.

### 4. Material Reimbursements to Faulkner

57.     Defendants knew that in 2011 and 2012 Breitling had reimbursed Faulkner for approximately $2.5 million in purported company expenses. Further, Defendants knew that Breitling did "not have policies in place to assign authority, accountability, or control," for these and other expenses, noting that Faulkner held "ultimate authority and authorize[d] all transactions."

58.     Notwithstanding that "no invoices or detailed explanations were provided to" Rothstein, Defendants "gain[ed] comfort" with respect to these transaction by merely "confirm[ing] the balance[s] directly with" Faulkner -- despite the questionable nature of these expenditures and reimbursements. Any "comfort" gained by Rothstein was certainly unreasonable -- particularly in light of the approximately 20 "Internal Control Issues" raised by Rothstein in its Issues Memorandum (detailed below).

59.     Defendants knew that there was an inadequate segregation of duties surrounding significant processes such as Faulkner's expense reports and lack of proper documentation. In this regard, the Director of Administration (Enforcement Action defendant Beth Handkins ("Handkins")) prepared Faulkner's expense reports using generalized expense names such as "Leads" or "Reimbursements", and had Faulkner approve these reports for payment. The "Leads"

expense, which amounted to over $1 million, had no support for it besides Faulkner's confirmation that he was being reimbursed for these expenses.

60.     Moreover, Defendants knew that there was an inadequate segregation of duties surrounding significant processes such as the cash receipts and cash disbursements process. In this regard, Handkins received and deposited all Breitling checks. There was no review of deposit slips or reconciliation of bank statements by an independent party. Handkins was further able to use the Breitling debit card without any authorizations from other parties, and to issue checks without formally documenting prior approvals from Faulkner or other parties.

61.     Notwithstanding the above knowledge, Defendants failed to adjust the scope of the audit to account for potentially fraudulent activity. Had they done so, they would have uncovered that Faulkner had misappropriated over $9 million in the years for which Defendants were conducting their audit, plus approximately $3.4 million in the first eight months of 2013, prior to the Audit Entities' engagement of Rothstein. Defendants ultimately issued an unqualified audit opinion of the Audit Entities' financial statements notwithstanding their knowledge of the material reimbursements made to Faulkner purportedly for millions of dollars in company expenses, and without adequate controls to ensure they were legitimate. This knowledge should have triggered increased scrutiny by Defendants with respect to potential fraud occurring at Breitling, but Defendants ignored these clear red flags, violating their duty to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses.

5.  *Complete Lack of Internal Controls*

62.     Defendants knew of numerous material internal control issues that should have triggered increased scrutiny by Defendants with respect to potential fraud occurring at Breitling but failed to increase their scrutiny with respect to potential fraud.

63.     Defendants knew that the control environment was severely flawed because (1) Faulkner and Handkins did not demonstrate a sufficient level of knowledge to oversee the financial reporting or internal control processes at Breitling; (2) Faulkner and Breitling officers did not properly demonstrate sound ethical values in the Company; (3) Breitling does not have policies in place to assign authority, accountability, or control; and (4) Breitling does not show that they are committed to competence for the jobs performed.

64.     With respect to the failure properly to demonstrate sound ethical values, Rothstein knew that Faulkner was charged with possession of cocaine in 2011, Handkins had paid for her DWI fines through company accounts, and the Chief Operating Officer had the company pay for individual tax penalties and back taxes from the IRS to avoid the seizure of his personal assets.

65.     Defendants continued to conduct the audit, failed to adjust the scope of the audit to account for potentially fraudulent activity, and ultimately issued an unqualified audit opinion of the Audit Entities' financial statements notwithstanding their knowledge of the complete lack of internal controls, and how the lack of controls, in the context of the other knowledge they had (as alleged herein), could facilitate fraud at Breitling. This knowledge should have triggered increased scrutiny by Defendants with respect to potential fraud occurring at Breitling, but Defendants ignored these clear red flags, violating their duty to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses.

   6.   *Defendants' Failed to Track the Use of Proceeds in Auditing the Financial Statements in Accordance with GAAS*

66.     Under GAAS rules governing due professional care, internal controls, and competent evidentiary matter, among others, Defendants were duty bound to track investor funds obtained by Breitling and confirm that investor funds intended to be expended towards oil-and-gas interests were in fact transferred for that purpose.

67.     Defendants knew that investor funds were obtained upon materially misleading AFEs, which grossly inflated, without any reasonable basis, the costs to drill and operate the oil-and-gas interests underlying the offerings. Defendants, accordingly, knew that Breitling was not entitled to retain these funds, and that Defendants could not issue any unqualified opinion with respect to financial statements which included these revenues.

68.     Defendants also knew that these illicitly obtained investor funds were transferred to "operating accounts" where they were comingled with funds of investors in other distinct offerings, rather than being expended towards oil-and-gas interests underlying the respective offerings. Defendants further knew that these funds were then used, among other things, to pay millions of dollars' worth of various "expense reimbursements" claimed by Faulkner with vague descriptions and without supporting documentation. Rather than require documentation to support these claimed reimbursements, Defendants "gain[ed] comfort" relying on the word of Faulkner that the millions of dollars' worth of various "expense reimbursements" were legitimate. Defendants relied solely on Faulkner's word notwithstanding that they knew he was charged with cocaine possession in 2011 and "[did] not properly demonstrate sound ethical values."

69.     By ignoring the drastic effects that the materially misleading AFEs had on BECC's revenues and bottom line, and merely suggesting that BECC defer these revenues until such time as the prospects were completed, Defendants gave Faulkner cover to keep and use these revenues it knew to have been illicitly obtained.

70.     In continuing the audit, failing to adjust the scope of the audit to account for potentially fraudulent activity, and ultimately issuing the unqualified audit opinion Defendants failed to meet their burden under GAAS. Defendants' failure to meet their burden under GAAS

and disregard of their obligation to track such investor funds constitutes another major audit failure, causing millions of dollars in losses to Breitling.

7. *Failure to Require Going Concern Disclosure and Modify Audit Opinions*

71.     Under SAS 59, Rothstein had to consider the Breitling entities' ability to continue operations as a going concern, and was required under SAS 59 to modify its opinions and disclose that there was substantial doubt about the ability of Breitling to continue as a going concern. Defendants knew that the AFEs in the CIMs contained cost estimates that had been materially inflated without any reasonable basis and against industry norms. They further knew that Breitling's ability to meet its obligations going forward were contingent upon the recognition of these illicit revenues as legitimate, and Breitling's ability to continue to convince investors to participate in ongoing offerings upon materially misleading information. Even with these illicit revenues, Defendants expressed apprehension to Faulkner and Breitling officers with respect to the going concern issue, and ultimately required a liquidity footnote be included in their financial statements, which was clearly insufficient under the circumstances.

72.     Defendants' permitting the inclusion of a liquidity footnote, and issuance of an unqualified audit opinion without any such going concern disclosure, evidences yet another major failure in Defendants' audit that materially aided Faulkner's fraudulent scheme and damaged the Breitling entities.

8. *Failure to Classify and Disclose Crude as a Consolidated Entity / Variable Interest Entity*

73.     Defendants also failed properly to consider and apply GAAP guidance governing consolidation for Breitling's financial statements. Under FASB Interpretation Nos. 46 and 46R, Defendants were required to understand Breitling's overall business model and the relationships

between its affiliated entities -- the "big picture" -- by considering the substance of relationships among related business entities to determine consolidation for financial reporting purposes.

74.     Proper consideration and application of FIN 46 in auditing Breitling would have required Breitling to disclose Crude as consolidated entities. In December 2013, Defendants discussed how Crude should be a variable interest entity ("VIE") and consolidated with BECC for accounting purposes because "Crude relie[d] on Breitling in order to continue its business." In other words, "Breitling would lose its revenue stream and back office group [if Crude was to fail] and have to bear the risk of bringing those employees into Breitling in order to continue back office services." Importantly, "Crude solely relie[d] upon Breitling to continue operations for the foreseeable future. Crude ha[d] no customers, cash flows, or prospects without Breitling as of [that time]. The [ASA] all but force[d] Crude to use Breitling as its sole source by making them pay $100,000 a month for the leads."

75.     Notwithstanding its own analysis that Crude was a consolidated entity, Rothstein issued its unqualified audit opinion without requiring such a disclosure to the public. As Rothstein was aware, the only disclosure BECC made about consolidation in its March 31, 2014 Form 10-KT omitted any discussion of Crude. Defendants were aware of BECC's actual relationship with Crude and had access to financial information which showed Crude's true, consolidated relationship with BECC. This knowledge should have triggered increased scrutiny by Defendants with respect to potential fraud occurring at Breitling, but Defendants ignored these clear red flags, violating their duty to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses.

**C. Defendants' Acts and Omissions in Performing the Breitling Audit Caused the Breitling Entities to Sustain Substantial Damages**

76.     As an independent auditor, Rothstein was tasked to serve the Breitling entities and as a public watchdog to protect the public's interests vis-à-vis the financial statements disclosed by Breitling to the public through its filings with the Commission. Defendants utterly failed to fulfill their obligations. Because of Defendants' numerous failures Faulkner was able to continue his fraudulent scheme for years, funding his life of luxury upon millions of dollars of misappropriated Breitling assets. Moreover, Breitling liabilities increased by tens of millions of dollars with respect to more than one thousand innocent investors, and by millions of dollars with respect to the professionals that Breitling necessarily had to engage -- including without limitation professionals engaged to defend Breitling in the Commission's investigation, and by the Receiver in his administration of the Receivership Estate.

77.     When Defendants turned a blind eye to the red flags they encountered during Rothstein's audit and thereafter issued the unqualified audit opinion for the Audit Entities, they breached the duties that they owed to their Breitling clients. Moreover, the circumstances under which Rothstein issued its unqualified audit opinion demonstrate a betrayal of the public trust. Breitling, aided by Defendants' negligence, fraudulently sold tens of millions of dollars' worth of securities to investors, with very little of these funds remaining in segregated accounts for use in authorized purposes, as Defendants knew. Instead, Faulkner diverted and distributed substantial sums for his own personal benefit and in support of his lavish lifestyle, as he had done in the time periods subject to the audit. Despite their knowledge of the red flags which would have tipped off a certified public accountant of ordinary skill and knowledge to Faulkner's fraud, Defendants refused to lift the veil on the Breitling fraudulent scheme. If Defendants had exercised even a minimum level of the independence, inquiry, and professional skepticism required of independent

auditors, then they would have revealed the fraudulent scheme many years ago, saving Breitling tens of millions of dollars in losses that would not otherwise have been incurred and in increased liabilities to professionals and other creditors.

## V.   STATUTE OF LIMITATIONS DEFENSES

### A.  Discovery Rule / Inquiry Notice / Equitable Tolling

78.     The Receiver was appointed in the Enforcement Action on August 14, 2017 with respect to "***oil-and-gas related*** assets – in any form or of any kind whatsoever – owned, controlled, possessed, or managed, directly or indirectly, by" Faulkner, BOG and BECC. *See* Case No. 3:16-cv-01735-D, ECF No. 108 at p. 1 (emphasis added). On September 25, 2017, the Receiver was appointed with respect to "***all*** assets – in any form or of any kind whatsoever – owned, controlled, possessed, or managed, directly or indirectly, by" Faulkner, BOG and BECC. *See* Case No. 3:16-cv-01735-D, ECF No. 142 at p. 1 (emphasis added). On September 12, 2018 the Court expanded the Receivership Estate to include Enforcement Action defendant Patriot and other Enforcement Action non-parties, including BRC. *See* Case No. 3:16-cv-01735-D, ECF No. 320 at p. 1. On March 26, 2019, the Court expanded the Receivership Estate to include Enforcement Action defendant Crude Energy and Enforcement Action non-party Crude Royalties. *See* Case No. 3:16-cv-01735-D, ECF No. 418 at p. 1.

79.     Pursuant to the Receivership Order, with respect to "a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action." ECF No. 108 at ¶22, ECF No. 142 at ¶34, ECF No. 320 at ¶34, ECF No. 418 at ¶34. On March 13, 2019 the Enforcement Action Court entered an Order Granting the Receiver's Motion for Leave to Commence Ancillary

Litigation (Case No. 3:16-cv-01735-D, ECF No. 410), stating that the provisions of Paragraph 34 of the Receivership Order tolling applicable statutes of limitation as to Rothstein would remain in force through May 12, 2019 (60 days from the date of the Order). Effective May 7, 2019, the Receiver and Defendants executed a Tolling Agreement which stated that the time from May 7 through July 5, 2019 would "not be included in calculating any time period(s) applicable to any Timing Defenses to the Parties' respective Claims."

80.     Plaintiff did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, Defendants' connection to the Breitling fraudulent scheme and the true nature of the injury suffered. Moreover, Defendants' wrongful acts were inherently undiscoverable. Plaintiff also asserts the doctrine of equitable tolling. Additionally, the Breitling entities were not able to bring the causes of action asserted herein until they were "freed of [Faulkner's] coercion by the court's appointment of [the] [R]eceiver." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013).

## VI.   CAUSES OF ACTION

81.     For each of the following causes of action, Plaintiff incorporates by reference and reasserts the allegations above as if fully set forth below.

### COUNT I: Negligence/Gross Negligence

82.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

83.     Defendants owed a duty to the Audit Entities (including to Crude and Patriot, BECC's consolidated subsidiaries and alter egos) to conduct their audit through the exercise of the degree of care, skill and competence that reasonably competent members of their profession would exercise under similar circumstances. Defendants' negligent acts or omissions breached that duty

to Breitling. Defendants' breaches of this duty proximately caused injury to Breitling by enabling Faulkner to continue his fraud, misappropriating over $18 million from Breitling, causing these companies to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. As a result of Defendants' breaches, Breitling suffered millions of dollars in damages. But for Defendants' acts and omissions, the scale and duration of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced. Defendants' conduct constituted gross negligence as that term is defined in TEX. CIV. P. & REM CODE § 41.001. Accordingly, Plaintiff is entitled to recover exemplary damages.

## COUNT II: Aiding, Abetting, or Participation in Breaches of Fiduciary Duties

84.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

85.     Faulkner owed fiduciary duties to the Breitling entities. He breached his fiduciary duties by causing BOG, BRC, BECC, Crude and Patriot to engage in an illegal fraudulent scheme that enabled Faulkner to misappropriate millions of dollars from the Breitling entities, causing these entities to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities.

86.     Defendants knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties. Defendants knew Faulkner owed fiduciary duties to these entities, and Defendants were aware that Faulkner was breaching his fiduciary duties. Defendants also knew that they were aiding, abetting, or participating in these breaches of fiduciary duties by the conduct alleged herein. Faulkner's fiduciary breaches and Defendants' participation in these breaches

enabled Faulkner to continue his fraud, misappropriating over $18 million from Breitling, causing these companies to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. But for Defendants' acts and omissions, the scale of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

87.     Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would result in extraordinary harm to the Audit Entities. Accordingly, Plaintiff is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

## COUNT III: Aiding, Abetting, or Participation in Faulkner's Fraudulent Scheme

88.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

89.     By its conduct described herein, Defendants aided, abetted, and/or participated with Faulkner in the fraudulent scheme carried out by him through Breitling. In particular, Defendants' services assisted the fraudulent scheme that enabled Christopher Faulkner to fraudulently offer securities to public investors and misappropriate over $18 million from BOG, BRC, BECC, Crude and Patriot. Defendants' conduct caused these entities to suffer additional losses and caused these entities to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. As a result of this conduct, Defendants are directly liable for fraud, and their actions, in combination with the actions of Faulkner, are a proximate cause of actual damages to BOG, BRC, BECC, Crude and Patriot in the millions of dollars.

**COUNT IV: Avoidance of Fraudulent Transfers**

90.    The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

91.    Between December 1, 2013 and April 1, 2014, and at the direction of Faulkner, BOG and BECC made transfers totaling at least $215,000 to Rothstein.

92.    Faulkner caused BOG and BECC to make these transfers with actual intent to hinder, delay, or defraud creditors of BOG and BECC. Rothstein was engaged, and these transfers were made, at Faulkner's direction in furtherance of the fraudulent scheme alleged herein. Faulkner engaged Rothstein, and caused the reverse merger transaction with Bering Exploration, in order to continue, and expand upon, his fraudulent scheme.

93.    Pursuant to the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE §24.001 *et seq.* ("TUFTA"), the Receiver may avoid these transfers from BOG and BECC to Rothstein.

94.    Rothstein cannot meet its burden of proof with respect to the TUFTA statutory affirmative defense (at § 24.009(a)). The good faith requirement of the TUFTA affirmative defense requires a transferee show objective, rather than subjective good faith -- *i.e.*, whether the transferee objectively "knew or should have known" of the fraudulent nature behind the transfers. *In re IFS Fin. Corp.*, 417 B.R. 419, 442 (S.D. Bankr. Tex. 2009). A transferee knew of the fraud if it had actual knowledge of the fraud. *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001). A transferee should have known of the fraud if it received a transfer with knowledge of facts that would excite the suspicions of a person of ordinary prudence and if diligence would lead to knowledge of the transferor's fraudulent intent. *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009); *see also Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005) (defining good faith as lack of awareness of transferor's intent).

95.     Rothstein had actual knowledge of, or but for its negligence and gross negligence, should have known of, Faulkner's fraudulent misrepresentations made in the Breitling offering documents, his misuse of investor proceeds, and his misappropriation of millions of dollars in Breitling funds.

96.     The Receiver is entitled to his costs and reasonable attorney's fees as are equitable and just, pursuant to TUFTA § 24.013.

## VII.  ACTUAL DAMAGES

97.     BOG, BRC, BECC, Crude and Patriot have suffered losses of millions of dollars as a result of the diversion and misappropriation of millions of dollars from them by Faulkner, millions of dollars of losses on uses of investor proceeds at the direction of Faulkner that were contrary to representations made to investors regarding how their money would be invested, and millions of dollars of increased liabilities owed by BOG, BRC, BECC, Crude and Patriot to creditors, including without limitation professional and administrative liabilities, all under Rothstein's watch as auditor. These losses were proximately caused by Defendants' wrongful conduct. Additionally, the Receiver is entitled to recover its just and reasonable attorneys' fees, subject to Court approval, for it would be inequitable not to award such fees to the Receiver. The Receiver has retained the undersigned attorneys and has agreed to pay them a reasonable attorneys' fee for their work.

## VIII.  PUNITIVE DAMAGES

98.     The Receiver's injuries resulted from Defendants' gross negligence, malice, or actual fraud, which entitles the Receiver to exemplary damages in an amount necessary to punish Defendants, and to deter similar conduct by others in the future.

## IX.  <u>CONDITIONS PRECEDENT</u>

99.    All conditions precedent to filing this Complaint have been met.

## X.  <u>JURY DEMAND</u>

100.    The Receiver demands a trial by jury.

## XI.  <u>PRAYER</u>

101.    The Receiver requests that Defendants Rothstein and Matlock be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Receiver recover its damages as alleged herein, including its actual damages, punitive damages, and its costs and expenses of suit, including reasonable attorneys' fees. The Receiver prays for such other relief to which it may be justly entitled.

Dated: July 1, 2019

Respectfully submitted,

*s/ Donald R. Littlefield*
Donald R. Littlefield
Texas Bar No. 12427350
dlittlefield@ballardlittlefield.com
BALLARD & LITTLEFIELD LLP
16475 Dallas Parkway, Suite 400
Addison, Texas 75001
Phone: 972-733-2900
Fax:    713-403-6400
**ATTORNEYS FOR  TEMPORARY
RECEIVER, THOMAS L. TAYLOR, III**

**Of Counsel:**
Charles A. Hammaker
Texas Bar No. 08853700
ahammaker@ballardlittlefield.com
BALLARD & LITTLEFIELD LLP
3700 Buffalo Speedway, Suite 250
Houston, Texas  77098
Telephone:  (713) 403-6400
Facsimile:  (713) 403-6410

Thomas L. Taylor III
Texas Bar: 19733700
taylor@tltaylorlaw.com
THE TAYLOR LAW OFFICES, PC
245 West 18th Street
Houston, Texas 77008
Tel: 713.626.5300
Fax: 713.402.6154
**COURT-APPOINTED
TEMPORARY RECEIVER**